# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

JOSEPH LAGANA :
:
    Plaintiff :
v : Civil Action No.: PJM-10-3493
:
DR. TESSEMA, *et al*. :
:
    Defendants :

o0o

## MEMORANDUM OPINION

Pending is Defendants' Motion to Dismiss or for Summary Judgment. ECF No. 14. Plaintiff opposes the motion. ECF No. 23. Upon review of the papers filed, the Court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2011). For the reasons set forth below, Defendants' Motion to Dismiss or for Summary Judgment, construed as a Motion for Summary Judgment, shall be granted.

## Background

On February 5, 2010, Plaintiff injured his knee when he stepped over a mattress blocking the doorway to his prison cell. As he stepped across the mattress he slipped and heard a loud pop in his right knee, causing immediate pain. Plaintiff was able to continue standing and explains that his footing was not stable due to a torn meniscus in his left knee suffered 10 years prior, which has never been surgically repaired. Following the popping sound in his right knee, Plaintiff states his knee became swollen within an hour and soon became so swollen and painful he could not put pressure on it to climb into his bunk. Plaintiff sought medical attention for the knee through use of a sick call slip. ECF No. 1 at Att. 1, p. 1.

During his first visit with Physician's Assistant Greg Flury, Plaintiff was told his knee was too swollen to do anything with it and he was scheduled to be seen again in four weeks at

which time x-rays and cortisone shots would be ordered. Plaintiff claims the appointment with Flury was not documented and that Flury falsified records stating that physical diagnostics were performed. Plaintiff states that one week after seeing Flury, the pain in his right knee was so intense he could not sleep through the night. He again requested medical attention through sick call slips. ECF No. 1 at Att. 1, pp. 1 – 2.

Plaintiff claims that despite repeated requests to be seen which included writing to the "sick call supervisor," he was denied medical care. Plaintiff was ultimately seen by Physician's Assistant Beverly Sparks, who examined his knee and concluded there was no swelling despite what Plaintiff describes as obvious swelling. Plaintiff was already taking Naproxen for pain relief in his left knee, but the medication was not effective at relieving the pain in his right knee. Nurse Delores Adams told Plaintiff the symptoms he described for his right knee sounded like a problem with a tendon. Plaintiff then wrote to Barbara Newlon, health services liason, and to Sharon Baucom, because he knew the problem with his knee was not related to a tendon. *Id*. at p. 2. Plaintiff again sought medical care and was seen again by Sparks and Adams, who noted the fluid on Plaintiff's knee and ordered an x-ray. Sparks also sought to have Plaintiff's knee drained, but refused Plaintiff's request to be seen by specialist. *Id*.

Plaintiff claims he was told he could not be referred to a specialist because Baucom had ordered that physician's assistants were to be utilized more and that doctor's visits were to be reduced. Plaintiff claims he finally saw Dr. Arnaout 90 days after the initial injury, who noted the swelling and ordered an MRI because he suspected Plaintiff had another torn meniscus. Plaintiff was not given pain medications because he alleges Dr. Arnaout wanted to wait until he received the MRI results. Within 24 hours of having the MRI, Plaintiff was seen by Dr. Tessema, who reported to Plaintiff that the MRI showed no cartilage tears, but did show a

Baker's cyst as well as signs of osteoarthritis. Plaintiff asked if there could be something else wrong with his knee and Tessema told him there would be no way to be sure without surgery and the MRI findings did not justify surgery. Tessema prescribed Motrin to help reduce the swelling and assured Plaintiff that cortisone shots would be pursued at a later date. Plaintiff asked about taking Celebrex, which he had taken before, but Tessema told him it had been taken off the market. Plaintiff also asked about Neurontin and Ultram, but Tessema advised that Neurontin was for nerve pain, not joint pain, and that Ultram was not appropriate for treatment of osteoarthritis. Plaintiff was later seen by Dr. Ottey, who ordered cortisone shots for June, 2010.

Plaintiff states that after the injury to his right knee he continued to experience intense pain that disturbed his sleep. He then realized that false medical reports were being written by medical personnel who saw him and that other prisoners were being provided comprehensive pain management treatment which he was being denied. ECF No. 1 at Att. 1, p. 4. Because the knee pain was disturbing his sleep, Plaintiff requested an increase in psychotropic medications which he had received for ten years for his bipolar disorder. Plaintiff did this in an effort to improve the quality of his sleep, but he was still awakened with excruciating pain after sleeping for three to four hours. *Id*. at p. 5.

Plaintiff states he received information from "reputable organizations" confirming that Ultram and Neurontin were legitimate drugs to prescribe for his condition and that cortisone shots were also recommended. Plaintiff claims he was told he could not have cortisone shots because of his housing status. Flury was the person who administered the shots and he only worked during the day; Plaintiff needed an evening appointment. *Id*.

Plaintiff requested to be put on Neurontin and Ultram again, but Dr. Ottey told him again that Neurontin was for nerve pain. Plaintiff claims that Ottey eventually agreed that the use of

3

both drugs was warranted by Plaintiff's condition, promised to order the drugs, but then failed to do so. Plaintiff claims Ottey said Tessema told him not to order the medications for Plaintiff. Plaintiff states a nurse named Bill witnessed Ottey telling him that pain medications would be ordered and if not received within three to five days, Plaintiff was advised to put in a sick call request to be seen by Ottey. Although Bill admitted overhearing Ottey's orders during an internal investigation conducted by Lauri Russell, Plaintiff was still denied pain medication. He claims he would have to put in two to three sick call requests over a two week period just to be seen. He states this occurred in violation of the medical contractor's policy that sick call requests must be scheduled within 24 to 72 hours of being received. ECF No. 1 at Att. 1, p. 6.

Plaintiff claims that Nurse Adams was in charge of investigation medical complaints (ARPs) and she would never fault medical staff for a claim even though there was clear evidence they had erred. Plaintiff claims Adams' refusal to fault medical staff is a part of a pattern of deliberate indifference on her part which began when she refused to acknowledge Plaintiff's injury. *Id*. at p. 7.

Plaintiff states Flury administered cortisone shots without lidocaine and did not put the cortisone where it was supposed to go. Plaintiff made Adams aware of this and she agreed with Plaintiff's assessment but dismissed his grievance. Plaintiff claims that when Flury became aware of the grievance filed by Plaintiff he retaliated by denying him further medical care. *Id*.

Plaintiff states when he saw Tessema again he asked why others were receiving Ultram, Neurontin, Nubain shots and Tylenol 3 for other "undiagnosed ailments," while Plaintiff was being denied those medications. Plaintiff claims Tessema told him that people receiving those medications were seriously ill with AIDS or cancer. Plaintiff states he knew this to be untrue as he was aware of many inmates receiving these medications who were not critically ill. Tessema

4

then prescribed Nortriptyline for treatment of Plaintiff's pain. Plaintiff reminded Tessema that he was already taking psychiatric medications and asked if the prescription for Nortriptyline needed to be cleared by his "psych doctor." Plaintiff claims Tessema denied needing to clear the prescription with anyone as the dose was very low. Plaintiff began taking the medication and experienced severe side effects immediately. Plaintiff states he researched the medication and the literature on its use stated it was contraindicated for persons suffering with mania. *Id*. at p. 8.

Plaintiff reported the side-effects to Sparks who refused to discontinue the medication and referred him back to Tessema. Plaintiff was seen by Tessema who discontinued the Nortriptyline, which Plaintiff states is prescribed for treatment of nerve pain. Tessema then prescribed Neurontin at a small dose to see if Plaintiff could tolerate it. Plaintiff states that Tessema also indicated that Ultram was appropriate for Plaintiff's pain, but said he could not order it since he was the regional doctor. *Id*. at p. 9.

Plaintiff claims he contacted Barbara Newlon on numerous occasions in an attempt to get relief and he was told to contact Janice Gilmore, Director of Nursing, instead. He claims, however, that when he contacted Gilmore she misled him about her authority and was belligerent in her approach. Plaintiff concluded that Gilmore was not interested in assisting him with his problem; therefore, he declined to contact her again. *Id*. at p. 10.

**Standard of Review**

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

5

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**Analysis**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) *citing Wilson v. Seiter*, 501 U.S. 294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical

need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted above, objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry. The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839- 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virgiinia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995), *quoting Farmer,* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown* 240 F. 3d at 390; *citing Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

In a light most favorable to Plaintiff, the Court will assume that the pain he experienced with his knee constitutes a serious medical need. Thus the remaining issue is whether Defendants provided reasonable treatment for Plaintiff's condition in light of their subjective

7

knowledge of the risks involved to Plaintiff, e.g., continued or increased chronic pain. Defendants characterize Plaintiff's claims as asserting that: (1) he was denied treatment for an injury to his right knee; (2) he was denied medication for his complaints of knee pain; (3) P.A. Flury gave him cortisone injections in his knees, but did not use cortisone and made the injections in the wrong place; (4) Defendants falsified records; and (5) Defendants lied to him about his diagnosis and treatments. ECF No. 14 at Memorandum, p. 2.

At the outset the Court notes that Defendants have mischaracterized Plaintiff's claim with respect to the cortisone injections provided. Plaintiff did not claim that he wasn't given cortisone; rather, he claimed he was not given Lidocaine, a numbing agent, when the cortisone injection was administered. ECF No. 1 and 23. Defendants provide medical records regarding the cortisone shot which indicate that anesthetics, including Lidocaine, were in fact administered. ECF No. 14 at Ex. C, p. 67. The only evidence Plaintiff relies upon to support his assertion that Lidocaine was not administered is his observation that there was only one injection site.[1] ECF No. 23. His ability or inability to observe a second injection site is not enough to overcome the contemporaneous record made documenting the procedure.[2] Plaintiff cannot create a genuine dispute of material fact through conjecture and speculation.

Plaintiff's injury to his right knee occurred on February 9, 2010. Between February 9, 2010 and March 2, 2011, Plaintiff submitted 45 Sick Call Request Forms, 17 letters to nurse managers, a letter to the Health Services Administrator for the Western Region, and one letter to Barbara Newlon, Agency Contract Operations Manager. ECF No. 14 at Ex. A, p. 3 and Ex. C. Often Plaintiff attempted to contact medical personnel through correspondence which was not

---

[1] Plaintiff complains that Nurse Adams did not believe his claim even though he showed her one injection site. ECF No. 23.

[2] The record does not indicate whether the two medications were administered using one needle.

necessarily forwarded as promptly as forms requesting sick call. He was counseled against the practice, but continued to use correspondence to contact personnel. *Id*. at Ex. C, pp. 95 – 96; 103 –107. Although medical staff may not have given Plaintiff the immediate attention he required, he was examined on numerous occasions and treated.

Plaintiff was evaluated by P.A. Flury on February 13, 2010, four days after the injury to his right knee. At the time Plaintiff was taking Naprosyn for pain in his left knee. When Flury examined him, Plaintiff's right knee was slightly swollen with full range of motion and good strength. Given these findings, no x-ray was ordered for Plaintiff's knee. Defendants agree that it is possible that Flury told Plaintiff if the knee did not improve cortisone injections could be administered for the pain. ECF No. 14 at Ex. B.

Plaintiff's right knee was evaluated again on March 15, 2010, by P.A. Sparks who noted the knee was non-tender and not swollen with full range of motion. Sparks continued Plaintiff's current medication based on her examination. *Id*. at Ex. A. Plaintiff claims Sparks and Adams falsified records to indicate that his knee was not injured; however, later tests performed on Plaintiff's knee revealed that he was suffering from osteoarthritis and did not have any torn ligaments or tendons.

Sparks examined Plaintiff's knee again on April 8, 2010, when he was complaining that the pain in his knee was worse at night. At that time Sparks noted there was fluid around the joint with mild tenderness when palpated, but that Plaintiff still had full range of motion. An x-ray was taken of the knee on April 15, 2010, and revealed no "acute disease." *Id*. at Ex. C at p. 18. On April 23, 2010, Plaintiff was seen by Dr. Arnaout because his right knee pain had worsened, making climbing stairs difficult. At that time Plaintiff's knee was mildly swollen and tender with limitation in movement when his leg was extended. Arnaout ordered an MRI to rule

9

out torn cartilage and ordered physical therapy. *Id*. at pp. 21 – 25. In addition, Plaintiff was provided with a knee brace on April 30, 2010. *Id*.

An MRI performed on May 11, 2010, showed Plaintiff's knee did not have any torn ligaments or cartilage, but there was a thinning of the cartilage indicating degenerative arthritis and a Baker's cyst.[3] On May 12, 2010, Dr. Tessema evaluated Plaintiff and discussed the MRI results with him. During the evaluation Tessema observed that Plaintiff was able to walk, sit, and climb up on the exam table without assistance while wearing handcuffs without exhibiting any signs of pain. Plaintiff explained that the pain in his knee intensified at night and indicated that the Motrin he had taken helped somewhat. Plaintiff asked about taking Celebrex which he had used in the past with some success. Tessema incorrectly informed Plaintiff Celebrex was off the market and advised that it was comparable to Motrin. Defendant Tessema claims he misspoke and meant to say Vioxx had been taken off the market, but notwithstanding the error, he did not think the benefits outweighed the risks associated with Celebrex. ECF No. 14 at Ex. A. Plaintiff then asked if he could be prescribed Glucosamine Chondroitin, which was provided to him.[4] Plaintiff's prescription for Motrin was also renewed. *Id*. at p. 6 and Ex. C, pp. 30—32, 34—35.

On May 26, 2010, Plaintiff was seen by Dr. Ottey. Plaintiff told Ottey that the pain in his knee was aggravated by sitting, walking, and standing. He also complained of instability, locking, tenderness, and weakness which interrupted his sleep. At the time Plaintiff's Motrin and Glucosamine Chondroitin prescriptions were still in effect and there was no swelling or fluid

---

[3] A Baker's cyst is a swelling on the back of the knee caused by fluid from the knee joint which can be caused by arthritis. ECF No. 14 at Ex. A, p. 5, fn. 2.

[4] "Glucosamine is a natural compound that is found in healthy cartilage. Glucosamine is commonly taken in combination with chondroitin, a glycosaminoglycan derived from articular cartilage. Use of complementary therapies, including glucosamine, is common in patients with osteoarthritis, and may allow for reduced doses of non-steroidal anti-inflammatory agents." ECF No. 14 at Ex. A, p. 6, fn. 3.

present in his knees. ECF No. 14 at Ex. C, pp. 28, 30 – 32, and 34 – 35.

Ottey evaluated Plaintiff again on June 23, 2010, noted that Plaintiff's condition remained unchanged, and added Indomethacin to Plaintiff's medications to help with the pain. On July 10, 2010, Ottey referred Plaintiff to P.A. Flury for steroid (cortisone) injections to his knees. While the injection order was pending Plaintiff continued to file sick call slips complaining of knee pain. He was seen on July 15, 2010, by Sparks and told her his pain was excruciating and that the Glucosamine Chondroitin and other medications were not helping. Plaintiff began demanding "something else for pain." ECF No. 14 at Ex. C, pp. 42, and 45 – 46. Plaintiff was seen again on August 4, 2010, by Sparks who noted Plaintiff's repeated requests for Nubain and Ultram, narcotic medications, to treat his pain. Sparks advised that Plaintiff's chart was being reviewed by Dr. Sharon Baucom, and that her recommendations would be followed. *Id*.at p. 50. Plaintiff was seen a third time on September 1, 2010, by Ottey who again noted Plaintiff's symptoms were unchanged. On the fourth occasion Plaintiff was seen while cortisone injections were pending, Ottey discontinued Plaintiff's medications because he was complaining of rectal bleeding. Another referral for cortisone injections to his knees was written and Ottey ordered another knee brace for Plaintiff.[5] *Id*. at pp. 53 – 54.

On September 14, 2010, Plaintiff was again seen by Sparks because he had complained he had not received his Motrin. The medication had been discontinued due to Plaintiff's complaints of melena.[6] Another knee brace was ordered for Plaintiff on September 18, 2010, and on September 21, 2010, after Ottey consulted the pharmacist about Plaintiff's medications, he was prescribed 1000 mg of Tylenol three times a day. The knee brace was received by

---

[5] Plaintiff refused to take the knee brace when it was brought to him by a nurse because he already had a similar knee support and he wanted a different type of support. ECF No. 14 at Ex. C. p. 58.

[6] Plaintiff has a history of gastrointestinal problems and NSAIDS, the type of medications he was prescribed, can cause gastrointestinal bleeding. ECF No. 14 at Ex. A. Melena is blood in the stool.

Plaintiff on September 22, 2010. ECF No. 14 at Ex. C, pp. 61 – 66. Thus, Plaintiff received treatment for his knee pain while waiting for the cortisone injection to be scheduled.

On October 3, 2010, Plaintiff received cortisone injections to both knees as prescribed by Ottey. In a follow-up appointment on October 13, 2010, Plaintiff said he had gotten some pain relief from the injections, but again requested Ultram or Tylenol with codeine for treatment of the pain. Tessema noted Plaintiff was able to walk to the Dispensary from his housing unit, located at the opposite end of the institution, without assistance. Additionally Plaintiff was able to sit down and get up while restrained with handcuffs with no difficulty or signs of pain.

Plaintiff's request for narcotic pain relievers was denied and he was instead offered Nortriptyline, an anti-depressant, as a trial for one month. *Id.* at Ex. C, pp. 67 – 69, 71—71, 74 – 77. Plaintiff claims he questioned the wisdom of giving him an anti-depressant given that he has bipolar disorder.[7] ECF No. 23. He states that Tessema insisted that he did not need to consult Plaintiff's "psych doctors" about prescribing the medication. Plaintiff received Nortriptylene from November 1 to 22, 2010. On November 15, 2010, Plaintiff reported to Sparks that the medication was making him feel jittery, but would not give her a straight answer regarding how bad the symptoms were. ECF No. 14 at Ex. C, pp. 80 – 83. Plaintiff claims, and Defendants do not dispute, that he experienced serious side effects as a result of taking Nortriptyline. *Id.* Plaintiff further claims he researched the medication and found out that it is contraindicated for persons who suffer with bipolar disorder.[8] The Court accepts Plaintiff's claims as true; Nortriptyline was not an appropriate medication to give to Plaintiff for pain management in light of his bipolar disorder. At most, however, the claim is one of medical

---

[7] Defendants do not contest that Plaintiff has bipolar disorder. ECF No. 14 at Ex. A.

[8] Use of Nortriptyline to treat a depressive episode in bipolar patients can trigger a manic episode and is not approved for use in treating bipolar depression. *See* http://www.drugs.com/pro/nortriptyline.html

malpractice or negligence and is not enough to sustain a constitutional claim of deliberate indifference to a serious medical need.

Plaintiff was then prescribed Neurontin on November 25, 2010, after his request for Ultram was again denied. *Id*. On November 30, 2010, Plaintiff was transferred to another prison and shortly after he arrived he was evaluated again for his complaints of pain by Flury. Plaintiff told Flury the Neurontin was not addressing his pain. In response, Plaintiff was referred to Tessema, who had prescribed the Neurontin and increased the dosage of Neurontin in an attempt to address Plaintiff's pain. ECF No. 14 at Ex. C, pp. 87 – 91. Plaintiff remained on the increased dose until January 11, 2011, when it was again increased by Dr. Getachew. *Id*. at pp. 112 – 114, 149 – 150.

Plaintiff was approved for another round of cortisone injections to both knees on January 21, 2011. On February 17, 2011, Plaintiff was again seen by Getachew for knee pain. Plaintiff explained that the Neurontin was not working and again asked about being placed on Celebrex, which he had taken in the past. After discussing side effects with Plaintiff, Celebrex was prescribed and Neurontin was discontinued. Plaintiff received the first dose of Celebrex on February 19, 2011. He submitted a sick call slip that day complaining that it did not relieve his pain. When Plaintiff was seen by Nurse Bray on February 22, 2011, he insisted on seeing a doctor to have his prescription changed despite reassurances that the medication might take up to a month of use before he experienced a notable difference in his pain. ECF No. 14 at Ex. C, pp. 116, 118, 120, 129 – 130, 133 – 140, 151 – 153.

Plaintiff's claim that Defendants were deliberately indifferent to the pain he was suffering is belied by the evidence submitted. The fact that his chronic arthritis pain was not instantly cured by the prescription medications and cortisone injections provided is not an indication of

malevolence on the part of Defendants. Rather, the limitations inherent in the medical treatment of osteoarthritic pain are the cause of Plaintiff's dissatisfaction. While the Court sympathizes with Plaintiff's frustrations, his claim of deliberate indifference to a serious medical need is unsupported by the evidence. Indeed, Plaintiff's claim that there is a widespread conspiracy among medical staff to falsify medical records appears to be his acknowledgment that the records submitted do not support his claims that his complaints are going unaddressed.

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (video tape utterly discredited plaintiff's version of the facts). Based on the record evidence, Defendants are entitled to summary judgment in their favor.

A separate Order follows.

August 12, 2011

/s/
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE